## The People of the State of Illinois ex rel. Peter P. Duket and John W. Novak, Appellant, v. The Department of Agriculture of the State of Illinois, Appellee.

### Gen. No. 7,771.

1. MANDAMUS—*clearness of right and certainty of duty as essential prerequisites to granting writ.* A writ of mandamus will not issue in a doubtful case, but only where the right of the relator is clear and undeniable and the party sought to be coerced is bound to act.

2. MANDAMUS—*issuance of permit to sell diseased animals as discretionary duty.* Under section 15, of the Act for the suppression and prevention of the spread of contagious and infectious diseases among domestic animals, Cahill's 1923 St. ch. 8, ¶ 61, in which it is provided that cattle which have reacted to the tuberculin test, provided they show no physical evidence of the disease, "may be sold and delivered within the State, provided the purchaser shall first secure a permit from the State Board of Live Stock Commissioners," the authorities charged with the enforcement of the act have it within their discretion to make no provisions for the sale of such cattle and the granting of a permit for the purchase of such cattle will not be enforced by mandamus.

Appeal by plaintiff from the Circuit Court of Sangamon county; the Hon. E. S. SMITH, Judge, presiding, Heard in this court at the October term, 1924. Affirmed. Opinion filed December 31, 1924.

CHARLES E. MILROY and FRANK H. NOVAK, for appellant; GEORGE E. AYRES, of counsel.

EDWARD J. BRUNDAGE, Attorney General, ALBERT D. RODENBERG and ASHTON E. CAMPBELL, Assistant Attorneys General and HENRY L. CHILD, Special Assistant Attorney General, for appellee.

MR. JUSTICE CROW delivered the opinion of the court. This case comes to this court on appeal by petitioner in the court below for mandamus against appel-

lee. Demurrer to the petition by respondent was sustained and the petition dismissed.

By the petition it appears the relators are copartners, doing business as Duket-Novak Stock Farm. That they are desirous of obtaining the official permit of the Department of Agriculture of Illinois to purchase cattle which heretofore reacted to the tuberculin test, but which show no physical evidence of the disease, under and according to the provisions of the statutes of Illinois, to wit, under paragraph 61, section 15 of chapter 8 thereof, [Cahill's 1923 St.] and which paragraph is set forth at large in the petition. That petitioners have repeatedly made application for such permit to respondent under and according to the provisions of said paragraph and offered in such applications to comply with all the terms of the statute in order to entitle them to such permit, but that they have been refused such permit absolutely and unconditionally by the respondent without its having the right to do so and in contravention of said statute. In the third paragraph of the petition they aver they made such application in writing and verbally, said application having been made to the Chief Veterinarian of the Department of Agriculture, and to other officers and agents of the department at different times stated in said paragraphs and that all of said requests were unconditionally refused by the Director of said department, who stated such permit would be issued only when compelled by writ of mandamus.

Following those averments of the petition are four pages stating the acreage of the farm possessed and operated by petitioners, its general nature and character as to sanitation, and the results of certain tuberculin tests to which cattle on the farm were subjected. It is also averred they have a remedy for the treatment of reacting cattle treated at the farm which, with all cattle thereon, has been under strict quarantine since September 15, 1923. These averments are

followed by a reference to exhibits A to J, made a part of the petition and purporting to show the results of treatment of cattle at the farm, and copies of certificates as to the nature and condition of the farm.

The paragraph preceding that praying for relief avers petitioners are desirous of carrying on upon the farm described in the petition "and elsewhere as they may choose properly in said State," the business of purchasing and maintaining under strict legal quarantine such reacting cattle as have given no physical evidence of disease and there treating them for the petitioners' own profit "and also incidentally" for the purpose of contributing to the eradication of tuberculosis among cattle of the State of Illinois. The scope of mandatory relief sought is that the Department of Agriculture be compelled to grant to petitioners a permit to purchase cattle described in the paragraph of the statute quoted in the petition under the conditions in that section prescribed, and which is hereafter more particularly noticed. This appeal presents the question whether the judgment of the circuit court sustaining the demurrer to the petition, thereby denying the writ of mandamus, was error. More narrowly stated, the point for judgment is, are relators entitled to the relief they demand?

The most elementary doctrine relating to mandamus as remedial process is that the writ will not issue unless the petitioner shows a clear legal right to the writ and unless the party applying for it shows a clear obligation on the part of the party against whom it is sought to do the thing petitioner seeks to have performed. It will not issue in a doubtful case, but only where the right of the relator is clear and undeniable and the party sought to be coerced is bound to act. *People v. Blair*, 292 Ill. 139 (144). The writ lies to enforce some duty of an imperative character imposed by law and involving no discretion in its exercise. *People v. La Buy*, 305 Ill. 11 (15). The right

to mandamus must be clear and it will not be sustained in a doubtful case or where the allegations in the petition fail to show a legal right to the writ. *Quernheim v. Asselmeier,* 296 Ill. 494 (499).

Viewing the petition in the light of the principles governing the allowance of the writ, it is necessary to examine the statute which appellants contend gives them the right and imposes on respondent the obligation necessary to support the relief. The section invoked, and as matter of pleading improperly copied into the petition, is one of fifteen sections added by an amendment to the Act of 1909 entitled: "An act to revise the law in relation to the suppression and prevention of the spread of contagious and infectious diseases among domestic animals." It is (section 15): "It shall be unlawful to sell, offer for sale, or to purchase any bulls, cows or heifers known to have reacted to the tuberculin test, except under regulations prescribed by the State Board of Live Stock Commissioners, to wit: Bulls, cows and heifers which have reacted to the tuberculin test, provided they show no physical evidence of disease, may be sold and delivered within the State, provided the purchaser shall first secure a permit from the State Board of Live Stock Commissioners, wherein it is agreed that such reacting cattle shall be kept separate and apart from all non-reacting cattle, and shall be maintained under strict quarantine until released therefrom for sale or slaughter under State or Federal inspection by permit issued by the State Board of Live Stock Commissioners." [Cahill's 1923 St. ch. 8, ¶ 61.]

The act of which this section is amendatory consisted of twelve sections. It created the Board of Live Stock Commissioners and State Veterinarian; authorized the quarantine of domestic animals afflicted with communicable diseases and provided for the care and disposition of such animals during quarantine and for their slaughtering under restrictions

imperative in their terms; provided for the inspection of such animals in infected districts or territory in the State, for notice thereof by proclamation and forbidding the removal of infected animals without having first obtained a special permit therefor; forbade the importation of such animals except under such restrictions and regulations as the board might make; authorized the removal of such animals or of exposed animals of infected districts upon such terms as should be prescribed; provided for penalties for concealment of diseases; provided for compensation for slaughtered animals. The fifteen amendatory sections are in furtherance of the purpose of the original act as disclosed by its title, the things directed and prohibited, and the plenary powers vested in the Board of Live Stock Commissioners and the State Veterinarians in the detection and suppression of disease. They all supply protective measures, without which the original act would or might be impotent. All the amendatory sections, except 16 and 17, relate to transportation of cattle and importation thereof and regulations necessary to furnish notice of such diseases in cattle in the stockyards districts of Chicago, East St. Louis and Peoria and to guard against the danger of the spread of contagion. Those stockyards centers are auxiliary to transportation of and commerce in live stock. By section 16 [Cahill's 1923 St. ch. 8, ¶ 62] the State Board of Live Stock Commissioners is charged with the enforcement of the provisions of the Act. By section 17 [Cahill's 1923 St. ch. 8, ¶ 63]: "No bulls, cows or heifers, now forming a part of the domestic herds of this State, or hereafter born and raised in this State, shall be subjected to the tuberculin test by the State Veterinarian or his assistants, without the consent of the owner thereof."

A careful consideration of the amendatory sections discloses a solicitous purpose to omit no regulation that would suppress or tend to suppress the dangers

to public health arising from the presence of tubercular cows. It is the direct exertion of the police power of the State for the preservation and conservation of the public health and general welfare in the important food items of milk, its products and of beef and veal. The legislature has endeavored, in its cooperation with the Federal Government, to aid in the regulation of the transportation and quarantine of such animals. The manifest purpose from the minute regulatory provisions is to keep well within the control of the responsible State agencies the animals mentioned, in furtherance of the end to be accomplished—an inhibition so far as practicable against the use of tubercular bulls, cows and heifers. The end given, every means to its attainment must be allowed. In the original and amendatory acts in the most solemn and mandatory manner human language can express "the State Board of Live Stock Commissioners is hereby charged with the enforcement of this Act." That is the mandate of supreme authority in this State. If the board was "charged" with the duty of enforcement, the legislative transfer of responsibility to the Department of Agriculture to "exercise the rights, powers and duties vested by law" in it did not abate or diminish the duty or responsibility one jot or tittle.

It is not matter of debate or serious doubt, it is believed, the duty to enforce the act carries with it discretion. It is the judgment, the discretion of the officials of the responsible department that must determine what is proper in the discharge of enforcement, except where the legislature has specifically designated what shall be done. Out of this fact arises the distinction between those acts the agent must or shall do and those he may do or omit at discretion. The former, the agent may be compelled to do; the latter will never be controlled by mandamus.

There is not a word or line in section 15 that in-

dicates or suggests any duty of the Department of Agriculture to act in furtherance of the sale of cattle known to have reacted to the tuberculin test. Such sale can take place only under regulations prescribed by the designated authority. There is no command to prescribe regulations. In the exercise of the strict duty of the enforcement of the Act the department may deem it best to make no such regulations. It, through its responsible and constituent agents, may believe the door ought not to be opened for the purpose the court is now asked to open it. That is matter of discretion no court will undertake to control. The section requires an agreement to be entered into by persons purchasing infected cattle. Surely the department has the right to select those with whom it will make an agreement—the very essence of discretion.

There being no averment in the petition that such regulations have been prescribed, the intendment must be against the pleader that there are none, which would of necessity prevent a sale. The relief sought seems to be to compel sales generally to relators, but the proposition is, in our opinion, clearly contrary to the letter as well as the spirit of the section relied upon. "It shall be unlawful to sell, offer for sale or purchase" any of such animals except under the regulations. Nothing indicates the lawmakers had in mind the sale in numbers or herds, or that they intended to encroach upon the duty so clearly imposed in the board. Clearly to the contrary, because it is only those bulls, cows and heifers "which have reacted to the tuberculin test" and "show no physical evidence of disease" that may be sold and delivered in this State. Who but they must be the judge of those precedent conditions? But the further condition restricts the sale to those who "shall first secure a permit" from the board. The board being charged with the enforcement of the Act, in the exercise of its dis-

cretion as the responsible agent of the State may be unwilling to allow the cattle to go into other hands. It cannot well be held responsible for the enforcement, if any one who sees fit to buy may demand the necessary permit and compel the making of regulations and entering into agreements warranting the sale.

There is a phase of this case as presented that does not appeal to the righteousness of relators' case, and that is the complaint of loss of profits arising from the refusal of respondent to give a permit enabling them to purchase diseased cattle. This feature may be dismissed with only the suggestion that the policy underlying the quarantine laws and restraints on the sale of diseased cattle will not be promoted by placing them in the care of those who expect afterward to reduce the flesh to human food, making it a source of profit to them. Of itself, that might be sufficient to control the discretion against granting a permit. Equally lacking in impressiveness is the averment in the petition relators have a remedy for diseases against which the legislation is leveled. Certainly the agents charged with the enforcement of the law would not be under obligation to abdicate their office to every one or to any one who should claim he had conquered disease. If not under obligation, mandamus must be denied.

Whether relators seek to purchase generally or only particular cattle, and whatever the purpose, the matter is one solely under the control of the Department of Agriculture to be exercised by it at discretion and mandamus will not lie. The judgment of the circuit court will be affirmed.

*Affirmed.*